# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MELINDA S. SHARPE, | ) |
|     Plaintiff, | ) |
| | ) |
| v. | ) 1:14-CV-184-TFM |
| | ) |
| COMMISSIONER OF SOCIAL SECURITY, | ) |
|     Defendant. | ) |

## MEMORANDUM OPINION

July 14, 2015

## I.  Introduction

Melinda S. Sharpe ("Plaintiff") has filed this action for judicial review of the decision of the Commissioner of Social Security, which denied her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 401-403, 1381-1383. The parties have filed cross-motions for summary judgment, ECF Nos. 10, 14, which have been fully briefed and are ripe for disposition. ECF Nos. 11, 15.

## II.  Background

Plaintiff is thirty-four years old. She graduated from high school and attended technical school for two years, obtaining a certificate in massage therapy. Over the years, she has worked in a number of different jobs, but she stopped working in March 2009 allegedly due to chronic back and abdominal pain.

Plaintiff's back problems began when she was in her late teens. Some years ago, she was diagnosed with degenerative disc disease of both the lumbar and thoracic spine, and underwent surgeries in September 2009, December 2009, and May 2011. Nevertheless, her back pain

1

persists.

As for her abdominal pain, Plaintiff went to the emergency room in April 2009 complaining of intermittent pain in her epigastric, left lower quadrant, and left flank areas. The cause of the pain couldn't be determined. But because of Plaintiff's history of polycystic ovarian syndrome, she was referred to her gynecologist to determine whether the pain could have been stemming from endometriosis[1] or problems with her pancreas or abdominal structures. There is no indication in the record that she followed up.

Following her visit to the ER, Plaintiff was also referred to a gastroenterologist, Dr. Segun Abogunde, whom she saw on several occasions between June 2009 and November 2010. Dr. Abogunde could never pinpoint the cause of her abdominal pain. At their first visit in June 2009, he noted that because Plaintiff had previously been diagnosed with leukocytosis (an increase in the number of white cells in the blood) and a CT scan reflected signs of diverticula, he wanted to perform another CT scan to rule out diverticulitis.[2] In March 2010, he opined that her symptoms were "suggestive of irritable bowel syndrome ["IBS"] with diarrhea," so he started her on a trial of concerta and nortriptyline, which was apparently helpful in treating her IBS-like symptoms. (R. 604, 606, 607). He also noted that she had a history of gastroesophageal reflux disease ("GERD") and prescribed protonix, which was also helpful. *Id.* In July 2010, Dr.

---

1. This "is an often painful disorder in which tissue that normally lines the inside of [a woman's] uterus – the endometrium – grows outside [her] uterus (endometrial implant)." Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/endometriosis/basics/definition/con-20013968 (last visited July 9, 2015).

2. "Diverticula are small, bulging pouches that can form in the lining of [a person's] digestive system . . . most often in the lower part of the large intestine (colon)." Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/diverticulitis/basics/definition/con-20033495 (last visited July 10, 2015). Usually, they don't cause problems. "Sometimes, however, one or more of the pouches become inflamed or infected. That condition is known as diverticulitis," which "can cause severe abdominal pain, fever, nausea and a marked change in [a person's] bowel habits." *Id.*

Abogunde once again suspected that Plaintiff had recurrent diverticulitis. As a result, he started her on a 14-day trial of the antibiotics ciprofloxacin and flagyl and prescribed pain medications. (R. 607-08). At his next appointment with Plaintiff a few months later, however, he remarked that Plaintiff's pain remained the same despite the attempted treatment and noted that the pain was "most likely functional in etiology."[3] (R. 609). He wanted to perform an upper endoscopy or colonoscopy to ascertain the cause of the pain, but Plaintiff declined because she did not have medical assistance and couldn't otherwise afford the procedures. When Dr. Abogunde next saw Plaintiff in November 2010, he again noted that she "may have functional abdominal pain with functional diarrhea." (R. 602).

Two days after her last visit with Dr. Abogunde, Plaintiff visited her primary care physician, Dr. Jeffrey Ghioto. She reported that her "GI specialist" – presumably Dr. Abogunde – told her that there was nothing else he could do for her, and she was apparently "very upset" with this news. (R. 356). Dr. Ghioto sent Plaintiff to undergo a magnetic resonance cholangiopancreatography scan, which reflected a bile duct stricture. She was thereafter referred to another gastroenterologist, Dr. Scott Henry. In a letter to Dr. Ghioto dated December 13, 2010, Dr. Henry said that his "concern is the possibility of primary and sclerosing cholangitis."[4] (R. 598). Two days later, he performed an endoscopic retrograde cholangiopancreatography, which showed "[l]ikely gastroparesis" – or delayed gastric emptying – "as evidence by retained

---

3. Saying that a patient's symptoms are "functional" is another way of saying that they are "unexplained by identifiable disease even after extensive medical assessment." National Institute of Health, http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1123778/ (last visited July 9, 2015). "Several general terms have been used to describe this problem – somatisation, somatoform, abnormal illness behaviour, medically unexplained symptoms, and functional symptoms." *Id.*

4. This is "a disease of the bile ducts, which carry the digestive liquid bile from [the] liver to [the] small intestine." Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/primary-sclerosing-cholangitis/basics/definition/con-20029446 (last visited July 10, 2015). "[I]nflammation causes scars within the bile ducts," and "[t]hese scars make the ducts hard and narrow and gradually cause serious liver damage." *Id.*

food within the stomach . . . ." (R. 597). Like Dr. Ghioto, Dr. Henry also saw signs of a "[s]ubtle ductal stricture of uncertain etiology and significant," but this did not appear related to Plaintiff's complaints of abdominal pain. (R. 597). At a follow up at the end of the month, Dr. Henry noted that the signs of gastroparesis could account for Plaintiff's pain, so he ordered her to undergo a gastric emptying study to confirm whether she had gastroparesis and also made arrangements for an endoscopic ultrasound. (R. 590). Meanwhile, he recommended that she start taking Reglan, but she was reluctant to do so until she received the results of the emptying study.

In late January 2011, another doctor in Dr. Ghioto's office, Dr. Frank McLaughlin, referred Plaintiff to a pain management specialist, Dr. Heath Fallin, after she continued to complain of abdominal pain. (R. 280). During her initial appointment with Dr. Fallin on February 16, 2011, she explained that she had obtained some relief from her back surgeries and medications, but her pain accompanied by nausea and vomiting persisted, though it wasn't as bad as it had once been. After examining Plaintiff and reviewing her records, Dr. Fallin noted that the source of the pain was "very unclear." (R. 281). "She appears to have really endorsed the role of being the patient," he wrote "and it is unclear how much of this is coming from an abdominal pathology and how much of this is psychogenic in nature." *Id.* Dr. Fallin's notes indicate that he discussed Plaintiff's past at some length with her and discovered that her abdominal pain had started on the heels of her divorce, when she moved back to Pennsylvania from Washington. He also noted that her ex-husband had been abusive. "It is not clear at this time if this new living arrangement is actually contributing to the pain," he wrote, "as the patient has been quite extensively worked up since she has returned to Pennsylvania and has some extensive secondary gain by having the role of the patient with an unclear etiology." *Id.* Because Dr. Fallin "fe[lt] that

[Plaintiff] possibly ha[d] some sort of somatization or somatoform disorder"[5] and may primarily be in need of psychological treatment, he referred her to a behavioral therapist for an evaluation. *Id.* He noted that he would consider giving Plaintiff thoracic epidurals in the future, but he didn't think that these would be effective. "Instead," he wrote, "I think the psychiatric and psychological workup . . . would really be key to her improving her functioning and getting back to living a normal life." (R. 282).

On March 1, 2011, Plaintiff returned to Dr. Fallin's office to undergo a thoracic epidural steroid injection. (R. 276). As Dr. Fallin prepared to insert the needle, however, Plaintiff "began to scream 'please stop, please stop,'" and the procedure was aborted. *Id.* Afterwards, because of Plaintiff's "somewhat hysterical status and recent history of polysubstance abuse" – she had apparently been using her mother's Percocet and smoking marijuana – Dr. Fallin held a meeting with Plaintiff and her mother. *Id.* He explained that he would feel uncomfortable performing other procedures on her in the future and reiterated that he "fe[lt] like there was a strong

---

5. "The somatoform disorders are a group of psychological disorders in which a patient experiences physical symptoms that are inconsistent with or cannot be fully explained by any underlying general medical or neurologic condition." Eve G. Spratt, M.D., et al., Somatoform Disorder, *Medscape Reference*, http://emedicine.medscape.com/article/918628-overview (last visited July 13, 2015). "The essential feature of a somatization disorder is a pattern of many physical complaints in persons younger than 30 years that occurs over several years and results in unnecessary medical treatment and/or causes significant impairment in functioning." *Id.* A patient's "symptoms are neither intentionally produced nor feigned and appear to be unconscious to the patient." *Id.* Historically, a handful of different conditions (somatization disorder, hypochondriasis, pain disorder, and undifferentiated somatoform disorder) were considered under the umbrella term "somatoform disorders." Somatic Symptom Disorder Factsheet, American Psychiatric Association, http://www.dsm5.org/documents/somatic%20symptom%20 disorder%20fact%20sheet.pdf (last visited July 13, 2015). The new *DSM-V*, however, replaces "somatoform disorders with somatic symptom and related disorders [("SSD")] and makes significant changes to the criteria to eliminate overlap across the somatoform disorders and clarify their boundaries." *Id.* To meet the *DSM-V* diagnostic criteria for SSD, "somatic symptoms must be significantly distressing or disrupting to daily life and must be accompanied by excessive thoughts, feelings, or behaviors." *Id.* In addition, "the individual must be persistently symptomatic (typically at least for 6 months)." *Id.*

psychiatric component to her pain and to exacerbating her pain." *Id.* In his view, "this abdominal pain ha[d] completely taken over her life," such that she had become "defined by [it]" and had "limited her life" because of it. *Id.* As he wrote, she "spends much of her time going to different physicians to try to get a different diagnosis or a better diagnosis of what is causing this abdominal pain. Up to this point, there has been no clear diagnosis." *Id.* As a result, Dr. Fallin once again "strongly recommend[ed] that she be evaluated by Psychiatry" since he believed "there is a strong possibility of somatization going on." *Id.*

The next day, Plaintiff heeded that advice and underwent a psychosocial evaluation. (R. 285-87). She acknowledged some anxiety but dismissed the possibility that her pain was caused by psychological issues. (R. 286). As the therapist noted, Plaintiff felt "that [this] is not an avenue that is going to bring her any kind of relief or get her the 'answers' that she needs." *Id.*

On February 22, 2011, following her brief stint at the pain clinic, Plaintiff returned to Dr. Ghioto's office for a follow up. (R. 349). Dr. Ghioto diagnosed her with chronic pain syndrome and prescribed her Percocet, only after making her sign a narcotics contract due to what had transpired with Dr. Fallin. The next month, she returned to Dr. Ghioto's office, still complaining of pain. Her white blood cell levels were high, so she was referred to an oncologist. When she saw the oncologist on April 1, 2011, her chief complaint was her abdominal pain. She had no other complaints or concerns.

That same day, Plaintiff had another appointment with Dr. Ghioto, who noted that her pain attacks were becoming more frequent. (R. 341). He again diagnosed her with chronic pain syndrome and started her on Dilaudid, noting that he would switch her to a longer-acting hydromorphone, Exalgo, if Dilaudid proved effective. An MRI was also ordered. Two weeks later, Dr. Ghioto noted that Dilaulid seemed to be helping, so he prescribed Exalgo. (R. 339).

6

Reviewing the results of the MRI, he observed that Plaintiff had multiple herniated discs in her thoracic spine. In early June, Plaintiff reported to Dr. Ghioto that she was still experiencing abdominal pain but with much less frequency. (R. 334). The pain had become "more midline" and was primarily "associated with bowel movements." *Id.* Plaintiff suspected that she had IBS and wanted to restart nortriptyline, which, as noted, had given her some relief in the past. Dr. Ghioto issued her a prescription as requested. When Plaintiff returned the next month with the same complaints, she was referred to a gastroenterologist, but there is no indication in the record that she followed through on the referral.

In the ensuing months, Plaintiff continued to follow up with both her primary care physician and her neurosurgeon, Dr. Peter Gerszten, regarding her back and abdominal pain. In October 2011, Dr. Gertzen found that Plaintiff might be having a recurrence of radiculopathy, for which he recommended Neurontin and a nerve root injection. (R. 390). Throughout 2012, she saw her physician on a routine basis with recurrent complaints of chronic back and abdominal pain. All the while, however, tests and examinations were still normal.

Plaintiff applied for DIB and SSI in November 2011. She claimed that she'd been disabled since March 31, 2009. (R. 225). After her claims were denied at the administrative level, she requested a hearing, which was held in November 2012 before Administrative Law Judge ("ALJ") Daniel F. Cusick. Plaintiff was represented by counsel and testified at the hearing, as did a vocational expert ("VE").

The ALJ issued a decision denying Plaintiff's claims for benefits on January 8, 2013. (R. 21-36). Following the Commissioner's sequential evaluation process,[6] the ALJ found at step two

---

6. To determine whether a claimant is disabled, the Commissioner must consider, in sequence, whether a claimant (1) is working, (2) has a severe impairment, (3) has an impairment that meets or equals the requirements of a listed impairment, (4) can return to his or her past

that Plaintiff's degenerative disc disease and obesity were severe impairments. At step three, the ALJ considered whether Plaintiff's impairments met or equaled the criteria for listing 1.04 and listings 1.00Q, 3.00I, and 4.00I, and found that those criteria were not met. Thus, prior to proceeding to the next step, the ALJ assessed Plaintiff's residual functional capacity ("RFC"). He found that she retained the ability to perform sedentary work, with occasional climbing of ladders, ropes, and scaffolds; occasional crouching and crawling; frequent climbing of ramps and stairs; and frequent stooping and kneeling. The ALJ in turn concluded that Plaintiff is not disabled at the fifth step of the sequential evaluation process based on the VE's testimony that there are jobs existing in significant numbers in the national economy that she can perform.

The ALJ's decision became the final decision of the Commissioner on April 29, 2014, when the Appeals Council denied Plaintiff's request for review. This appeal followed.

## III.    Legal Analysis

### A.    Standard of Review

The Act strictly limits the Court's ability to review the Commissioner's final decision. 42 U.S.C. § 405(g). "This Court neither undertakes a de novo review of the decision, nor does it re-weigh the evidence in the record." *Thomas v. Massanari*, 28 F. App'x 146, 147 (3d Cir. 2002). Instead, the Court's "review of the Commissioner's final decision is limited to determining whether that decision is supported by substantial evidence." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). If the Commissioner's decision is supported by substantial evidence, it is conclusive and must be affirmed. 42 U.S.C. § 405(g). The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate

---

relevant work, and (5) if not, whether he or she can perform other work that exists in significant numbers in the national economy. *See Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 545-46 (3d Cir. 2003) (quoting *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 118-19 (3d Cir. 2000)).

to support a conclusion." *Richardson v. Perales*, 402 U.S. 389 (1971). It consists of more than a scintilla but less than a preponderance of the evidence. *Thomas v. Comm'r of Soc. Sec.*, 625 F.3d 798 (3d Cir. 2010). Importantly, "[t]he presence of evidence in the record that supports a contrary conclusion does not undermine the Commissioner's decision so long as the record provides substantial support for that decision." *Malloy v. Comm'r of Soc. Sec.*, 306 F. App'x 761, 764 (3d Cir. 2009).

### B. Discussion

Plaintiff asserts several reasons why the ALJ's decision should be vacated and this matter remanded for additional consideration. At its essence, however, Plaintiff's argument is an attack on the ALJ's alleged failure to recognize that her abdominal pain may have been caused by psychological factors. The Court agrees that the ALJ erred in this regard.

The ALJ's errors began at step two of the sequential evaluation process. The ALJ acknowledged that Plaintiff has "long struggled with abdominal pain of unknown etiology despite multiple workups." (R. 24). But "based on the lack of objective evidence supporting the existence of a medically determinable impairment," the ALJ concluded that he was "constrained to find that [Plaintiff] does not suffer from a medically determinable condition" that could account for the abdominal pain. *Id.* (citing SSR 96-4p, 1996 WL 374187 (July 2, 1996)). Yet the ALJ failed to consider whether Plaintiff's pain could be stemming from a *mental* impairment. The record contains several signs suggesting that it might be. For one, after repeated attempts to ascertain the cause of the pain, Dr. Abogunde ended up concluding that it was "functional" in nature, which indicates that it cannot be explained by an identifiable physical impairment. Likewise, Dr. Fallin suggested on two occasions that Plaintiff's pain was due to "some sort of somatization or somatoform disorder" and that "there is a strong possibility of somatization

9

going on." These are just "fancy name[s] for psychosomatic illness, that is, physical distress of psychological origin." *Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (citations omitted). And Dr. Ghioto twice diagnosed Plaintiff with "chronic pain syndrome," which also suggests that Plaintiff's pain could be, in part, attributable to a psychological condition. *Lester v. Chater*, 81 F.3d 821, 829 (9th Cir. 1995) (recognizing that "'chronic pain syndrome' has both a physical and psychological component" and that the components are "not neatly separable"). Faced with this evidence, along with the fact that "the medical signs and laboratory findings" failed to "substantiate any physical impairment(s) capable of producing the pain," the ALJ had a duty to investigate whether the pain resulted from her possible somatoform disorder or some other mental impairment. 20 C.F.R. § 404.1529(b). In particular, the ALJ should have considered whether Plaintiff's possible somatoform disorder or chronic pain syndrome rose to the level of a medically determinable mental impairment[7] and, if so, proceeded to follow the rest of the special technique for evaluating mental impairments set forth in 20 C.F.R. § 404.1520a. Then, if he found one or both of these to be a medically determinable impairment, he should have considered whether they met the requirements of listing 12.07, the listing for assessing somatoform disorders.

---

7. A medically determinable impairment "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1508. A person's statement of symptoms is not sufficient to establish the existence of an impairment. *Id.* Instead, "medical evidence consisting of signs, symptoms, and laboratory findings" must be present. *Id.* There is, however, some tension between this requirement and what is required to diagnose somatoform disorder, which by its very nature is incapable of objective verification. "There are no specific physical examination findings or laboratory data that are helpful in confirming these disorders; it often is the lack of any physical or laboratory findings to explain the patient's excessive preoccupation with somatic symptoms that initially prompts the physician to consider the diagnosis." Oliver Oyama, Catherine Paltoo, & Julian Greengold, *American Family Physician*, Nov. 2007, at 1333-1338, *available at* http://www.aafp.org/afp/2007/1101/p1333.html (last visited July 10, 2015). Rather, a diagnosis is made primarily by excluding medical causes and two related disorders, factitious disorder and malingering. *Id.*

The ALJ's failure to appreciate the possible psychological origin of Plaintiff's pain infected subsequent parts of his analysis. For example, he assigned little weight to the disability forms completed by Plaintiff's treating physicians in part because "the records obtained from her primary care physician's office contain little in terms of objective medical findings . . . ." (R. 34). At the same time, the ALJ accorded "great weight" to the opinion of the state agency consultant because he thought it was "well supported by the medical evidence of record, which shows that the numerous evaluations conducted to diagnose the claimant's alleged abdominal pain have been negative." *Id.* However, the fact that the physician's notes didn't contain "objective medical findings" and that their "evaluations" were negative doesn't mean that Plaintiff's pain wasn't real and potentially disabling. None of the physicians who conducted these "negative evaluations" found that to be the case. Instead, as three doctors at least insinuated, the lack of objective findings was totally consistent with there being a "psychological origin of the pain." *Carradine*, 360 F.3d at 755. The ALJ erred by completely failing to explore this possibility.

The same goes for the ALJ's decision to discredit Plaintiff's "allegations regarding the severity of her pain" because they were "without substantial support from the objective medical evidence of record . . . ." (R. 34). Under the Social Security Administration's own regulations, the lack of objective evidence was not a sufficient basis to discount the credibility of Plaintiff's testimony about her symptoms. 20 C.F.R. § 404.1529(c)(2) (explaining that "we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements"). Indeed, "[t]here's nothing unusual about a person's having disabling symptoms that, though real, the doctors cannot explain – especially psychosomatic symptoms, which some of [Plaintiff's] symptoms may well have

11

been." *Williams v. Colvin*, 757 F.3d 610, 615 (7th Cir. 2014). Plaintiff made persistent complaints of disabling abdominal pain to several physicians over the course of three-plus years. Although these physicians could not discern the cause of the pain, each of them nonetheless accepted Plaintiff's complaints – not one suggested she was malingering – and prescribed a host of serious medications. So either Plaintiff was really good at faking her symptoms – so good, in fact, that her doctors risked violating their professional standards by prescribing her serious medications, including oxycodone. Or she was telling the truth about the debilitating nature of her pain. The former seems improbable. *See Carradine*, 360 F.3d at 755. But that, in effect, was what the ALJ concluded.

Taken together, these errors require the Court to remand this case to the ALJ. On remand, the ALJ must consider whether Plaintiff's abdominal pain could be rooted in a psychological condition, as there is evidence in the record suggesting that it is. This will require the ALJ to determine, consistent with the applicable regulations, whether Plaintiff has a mental impairment (be it a somatoform disorder or possibly some other condition like chronic pain syndrome) that rises to the level of a medically determinable impairment, and if so whether the criteria in listing 12.07 are satisfied. He will then need to reassess the credibility of Plaintiff's complaints in light of the possible psychosomatic nature of her symptoms. The ALJ will also need to reevaluate the amount of weight to which the opinion evidence in the record is entitled. To the extent that the ALJ finds that these issues cannot be resolved on the current record, he should order a consultative examination and have Plaintiff's mental status reevaluated. *See* 20 C.F.R. § 404.1519a. Also, the ALJ should consider recontacting Dr. Fallin (and possibly Dr. Abogunde) for clarification as to his suggestion that Plaintiff was suffering from a somatoform disorder. 20 C.F.R. § 404.1520b(c). Of course, the determination of whether this is necessary is left to the

discretion of the ALJ.

One final point bears mentioning. The Court recognizes that Plaintiff's counsel conceded at the hearing that this is a "physical case only" that "does not involve mental health issues." (R. 43). Despite that statement, the ALJ could not consider Plaintiff's pain in a vacuum. The physical component of the pain could not be divorced from the mental component. The record pointed to the existence of a possible mental impairment that could have caused Plaintiff's pain, so, because of the inquisitorial nature of Social Security proceedings, the ALJ had a duty "to investigate the facts and develop the arguments both for and against granting benefits" no matter what counsel represented at the hearing. *Sims v. Apfel*, 530 U.S. 103, 111 (2000).

## IV. Conclusion

The Court has three options whenever it is reviewing a decision of the Commissioner that has denied a claim for benefits. It can affirm the decision, reverse the decision and award benefits to the plaintiff, or remand the matter for further consideration. 42 U.S.C. § 405(g) (sentence four). In light of the foregoing, the Court will **REMAND** this case to the Social Security Administration for further proceedings consistent with this Memorandum Opinion. Nothing in this Memorandum Opinion should be construed as suggesting that Plaintiff is in fact entitled to benefits, as the ALJ's decision might ultimately turn out to be correct. However, because of the manifest errors the Court has identified, the ALJ's decision cannot stand. Accordingly, the Court will **GRANT** the motion for summary judgment filed by the Plaintiff and **DENY** the motion for summary judgment filed by the Commissioner. An appropriate order follows.

                                                McVerry, S.J.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MELINDA S. SHARPE,<br>    Plaintiff,<br><br>    v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br>    Defendant. | 1:14-CV-184-TFM |

## ORDER

**AND NOW**, this 14th day of July 2015, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED**, **ADJUDGED**, and **DECREED** that Defendant's MOTION FOR SUMMARY JUDGMENT (ECF No. 10) is **DENIED**, Plaintiff's MOTION FOR SUMMARY JUDGMENT (ECF No. 14) is **GRANTED** insofar as it seeks remand for further consideration, and the case is **REMANDED** to the Social Security Administration for further proceedings consistent with the foregoing Memorandum Opinion. The Clerk shall docket this case **CLOSED**.

                  BY THE COURT:

                  s/ Terrence F. McVerry
                  Senior United States District Judge

cc: **Karl E. Osterhout, Esq.**
   Email: karl@mydisabilityattorney.com

   **Christian A. Trabold, Esq.**
   Email: christian.a.trabold@usdoj.gov

   (via CM/ECF)